NO. 24-1780

IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

PIPER PARTRIDGE, *et al.*
*Plaintiffs-Appellants,*

v.

CITY OF BENTON, ARKANSAS, *et al.*
*Defendants-Appellees.*

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS

Case Number 4:17-CV-00460 BSM

THE HONORABLE BRIAN S. MILLER
UNITED STATES DISTRICT COURT JUDGE

_____

APPELLANT'S OPENING BRIEF

_____

GERAGOS & GERAGOS, APC
MARK GERAGOS
644 South Figueroa Street
Los Angeles, CA 90017-3411
Telephone: (213) 625-3900
Facsimile: (213) 232-3255

*Attorneys for Plaintiffs-Appellants*
PIPER PARTRIDGE, et al.

# SUMMARY AND STATEMENT ON ORAL ARGUMENT

Following a five-day trial, Appellants obtained a unanimous jury verdict against Appellees, City of Benton and former chief of police of the Benton Police Department, Kirk Lane under 42 U.S.C. § 1983 for violations of the Fourth and Fourteenth Amendments to the United States Constitution arising out of the unlawful fatal shooting of Keagan Schweikle ("Keagan"), for failing to investigate prior use-of-force incidents and failure to adequately train Benton Police Department officers. Appellants bring this appeal from the district court's grant of Appellees' Renewed Motion for Judgment as a Matter of Law, setting aside the jury's verdict.

At trial, Appellants presented ample evidence sufficient for the jury to find that Appellees City of Benton and Kirk Lane's failure to train and failure to investigate past misconduct caused Keagan's untimely death, which led the jury to find in favor of the Appellants on all claims brought against the Appellees. In granting Appellees' Renewed Motion for Judgment as a Matter of Law, the District Court ruled that the City of Benton and Kirk could not be found liable if the jury did not find that Defendant Kyle Ellison, the officer who killed Keagan, violated Keagan's rights. This was the third time the District Court has dismissed this case.

Due to the size of the record and the extensive appellate procedural history of this case before this Court, and the issues involved, counsel for Appellants requests twenty minutes per side for oral argument.

## TABLE OF CONTENTS

TABLE OF CONTENTS..............................................................................ii

TABLE OF AUTHORITIES ....................................................................... iv

JURISDICTIONAL STATEMENT……………….……………...…….…..1

STATEMENT OF THE ISSUES …………………………...…………...….2

STATEMENT OF THE CASE..................................................................... .3

SUMMARY OF THE ARGUMENT ....................................................24

ARGUMENT ..........................................................................................25

I.  THE TRIAL COURT ERRED IN GRANTING DEFENDANTS-
     APPELLEES MOTION FOR JUDGMENT AS A MATTER OF LAW
     (JMOL) SETTING ASIDE THE JURY'S VERDICT IN FAVOR OF
     PLAINTIFFS-APPELLANT…………………………………………25

     A. *The City of Benton and Chief Lane (in his official and individual*
        *capacity) can be held liable for failing to adequately train its*
        *officers and for failing to adequately investigate prior accusations*
        *of excessive force even if the officer who used deadly force against*
        *Keagan Schweikle was not held liable for violating Keagan's*
        *Constitutional Rights…………………………………..………*27

     B. *The jury had a legally sufficient evidentiary basis to find*
        *Defendants City of Benton, Arkansas and Kirk Lane, in his official*
        *and individual capacity, liable for Plaintiffs' failure train and*
        *failure to investigate claims……………….……………..…...*36

        *1.* Failure to Investigate Prior Use of Excessive Force……..……37

        *2.* Failure to Train……………….……..……….…………..…42

        3.  Municipal Liability…………….……………..…………...47

CONCLUSION……………………………………………………………...49

CERTIFICATE OF COMPLIANCE……………………………..……….…50

CERTIFICATE OF SERVICE …………………………………….………….51

**ADDENDUM**

Order Granting Defendants' Renewed Motion for

Judgment as a Matter of Law………………….………………....………... ADD 1

Judgment………………………………………………………….………… ADD 3

# TABLE OF AUTHORITIES

CASES                                                          PAGE

*Abbott v. City of Crocker, Mo.,*
    30 F.3d 994, 998–99 (8th Cir. 1994) ....................................................... 32-33

*Andrews v. Fowler,*
    98 F.3d 1069, 1078 (8th Cir. 1996) ....................................................... 33, 47

*Chen v. Mukasey,*
    510 F.3d 797, 801 (8th Cir. 2007) ................................................................23

*Choate v. Lockhart,*
    7 F.3d 1370, 1376 (8th Cir.1993) .................................................................33

*City of Canton v. Harris,*
    489 U.S. 378, 388 (1989) ................................................................. 32-33, 47

*City of Los Angeles v. Heller*,
    475 U.S. 796, (1986)............................................................................. *passim*

*Clay v. Conlee,*
    815 F.2d 1164 (8th Cir. 1987) ......................................................... 26, 30-31

*Farmer v. Brennan,*
    511 U.S. 825, 842, (1994) ...........................................................................34

*Hahn v. McLey,*
    737 F.2d 771, 773 (8th Cir.1984) .................................................................31

*Hyatt v. Robb,*
    114 F.3d 708, 711 (8th Cir.1997) .................................................................25

*Kahle v. Leonard,*
    477 F.3d 544, 551–52 (8th Cir. 2007) .........................................................34

*Livers v. Schenck,*
700 F.3d 340, 356 (8th Cir. 2012) ........................................................... 26, 30

*Mettler v. Whitledge,*
165 F.3d 1197, 1205 (8th Cir. 1999) ............................................................32

*Monell v. Dep't of Soc. Servs. of the City of New York,*
436 U.S. 658, 694 (1978) ....................................................................... 27, 29

*Morse v. S. Union Co.,*
174 F.3d 917, 922 (8th Cir.1999) ........................................................... 23, 25

*Ottman v. City of Indep., Mo.,*
341 F.3d 751 (8th Cir. 2003) ....................................................... 2, 26, 33

*Partridge v. City of Benton, Arkansas,*
929 F.3d 562, 566 (8th Cir. 2019) ..................................................................3

*Perkins v. Hastings,*
915 F. 3d 512 (8th Cir. 2019) ............................................................... 33, 46

*Rogers v. City of Little Rock, Ark.,*
152 F.3d 790 (8th Cir. 1998) ............................................................... *passim*

*Szabla v. City of Brooklyn Park, Minnesota,*
486 F.3d 385 (8th Cir. 2007) ......................................................................46

*Soltesz v. Rushmore Plaza Civic Ctr.,*
847 F.3d 941, 945 (8th Cir. 2017) ..............................................................23

*Speer v. City of Wynne, Arkansas,*
276 F.3d 980 (8th Cir. 2002) .............................................................. *passim*

*Tilson v. Forrest City Police Dep't,*
28 F.3d 802 (8th Cir. 1994) ........................................................2, 26, 31-32

*Wagner v. Jones,*
664 F.3d 259, 275 (8th Cir. 2011) ..............................................................34

*Wilson v. Brinker Int'l, Inc.,*
    382 F.3d 765, 769 (8th Cir. 2004) .............................................................23

## FEDERAL STATUTES

28 U.S.C. § 1291 ...........................................................................................1

28 U.S.C. § 1331 ...........................................................................................1

42 U.S.C. § 1983 ................................................................................. *passim*

Fed. R. Civ. P. 50 .........................................................................................23

## JURISDICTIONAL STATEMENT

On April 9, 2024, the United States District Court for the Eastern District of Arkansas, the Honorable Brian S. Miller presiding, issued an order granting Appellees City of Benton, Arkansas and Kirk Lane's ("Appellees") Renewed Motion for Judgment as a Matter of Law, vacating the jury verdicts entered against Appellees, and dismissing all claims against them with prejudice. Addendum ("ADD") 1-3; APP 1398-1400; R. Doc. 157,158. On April 12, 2024, Appellants timely filed their Notice of Appeal.

Pursuant to 28 U.S.C. § 1331, the United States District Court for the Eastern District of Arkansas had subject-matter jurisdiction over this matter because it arises under the United States Constitution and federal law.

Pursuant to 28 U.S.C. § 1291, this Court has appellate jurisdiction over this matter because the District Court issued a final order and judgment vacating the jury verdicts entered against Appellees, and dismissing all claims against them with prejudice.

# STATEMENT OF THE ISSUES

I. Did the trial court err in granting Defendants-Appellees Motion for Judgment as a Matter of Law (JMOL) setting aside the Jury's verdict in favor of Plaintiffs-Appellants determining that the City of Benton and Chief Lane (in his official and individual capacity) cannot be held liable for failing to adequately train its officers and for failing to adequately investigate prior accusations of excessive force if the officer who used the deadly force against Keagan Schweikle was not held liable for violating Keagan Schweikle's Constitutional Rights?

> ➢ *Rogers v. City of Little Rock, Ark.,* 152 F.3d 790 (8th Cir. 1998);
> ➢ *Speer v. City of Wynne, Arkansas,* 276 F.3d 980 (8th Cir. 2002);
> ➢ *Tilson v. Forrest City Police Dep't,* 28 F.3d 802 (8th Cir. 1994);
> ➢ *Ottman v. City of Indep., Mo.,* 341 F.3d 751 (8th Cir. 2003).

**STATEMENT OF THE CASE**

The parties to this appeal are Appellants, Piper Partridge, individually as mother and next of kin to Keagan Schweikle and as Special Administratrix of the Estate of Keagan Schweikle, and Dominic Schweikle, individually and as father and next of kin to Keagan Schweikle, Plaintiffs in the District Court, and Appellees City of Benton, Arkansas and Kirk Lane, Defendants in the District Court.

Appellants filed the complaint in this matter on July 17, 2017. Appendix ("APP") 1; R. Doc. 1. Appellees filed an Answer to Plaintiffs' complaint on August 2, 2017 and subsequently filed a Motion for Judgment on the Pleadings on September 14, 2017. APP 23; R. Doc. 10. APP 35; R. Doc. 13. On March 9, 2018, the District Court issued a Memorandum and Order granting Appellees' Motion for Judgment on the Pleadings, finding that Appellants had failed to state a claim upon which relief could be granted. APP 84; R. Doc. 22. Accordingly, the District Court dismissed Appellants' case in its entirety. APP 92; R. Doc. 23.

On April 9, 2018, Appellants filed their Notice of Appeal with this Court, and on July 3, 2019, this Court issued an opinion partially reversing the District Court's decision. APP 93; R. Doc. 35; *Partridge v. City of Benton, Arkansas*, 929 F.3d 562, 566 (8th Cir. 2019). On September 4, 2020, Appellees moved for summary judgment in the District Court. APP 113; R, Doc. 58. On August 30, 2021, the District Court again ruled in favor of Appellees and issued an Order

dismissing Appellants' case in its entirety, finding that Officer Ellison's use of force was objectively reasonable and that Appellees were therefore protected by qualified immunity. APP 954; R. Doc. 74. Appellants subsequently filed a Notice of Appeal on September 3, 2021. APP 962; R. Doc. 76. On June 12, 2023, this Court issued an opinion reversing the District Court's order in its entirety. APP 968; R. Doc. 80.

The jury trial in this matter commenced on January 29, 2024 and ended on February 5, 2024, when the jury entered verdicts in favor of Appellants, finding that Appellees City of Benton and Kirk Lane were liable for Plaintiff's failure to train and failure to investigate claims. APP 1299; R. Doc. 146. The jury found that former Defendant, Kyle Ellison, was not liable for Plaintiff's claims. APP 1296; R. Doc. 146. The jury awarded $30 million dollars against the City of Benton and $2 million in damages against Kirk Lane. APP 1299-1302; R. Doc. 146 at 4-7.

On February 1, 2024, Appellees made an oral motion for directed verdict, at that time the court reserved its ruling. TR., Vol. 4, p. 700-721 [In reference to the Eighth Circuit's previous opinion published on June 12, 2023, the Court stated "I think the Eighth Circuit is wrong as hell on that. I think it's wrong. I don't think that's the standard. I don't think that's what the standard has ever been. It's what the reasonable – what a reasonable officer would have perceived at the time, would he have felt in danger. So you don't have to actually put the gun on the person for

4

the officer to fire. The officer can have a reasonable perception that that's what's happening, and fire. They're wrong. And this is written – Judge Benton, love him to death, but this appears to be written by a law clerk who got emotional reading the file. That's what it looks like to me. But that's the law of this case."].

On February 9, 2024, Appellees filed Defendants' Renewed Motion for Judgment as a Matter of Law or in the Alternative, Motion to Alter or Amend the Judgment. APP 1303; R. Doc. 149. In their motion, Appellees argued that Plaintiff's claims against the City of Benton and Chief Kirk Lane must fail as a matter of law because former Defendant Officer Kyle Ellison ("Officer Ellison") was not found to have violated decedent Keagan Schweikle's ("Keagan") Constitutional rights. They further argued that Appellants provided no evidence of their failure to train and failure to investigate claims and that Appellee Kirk Lane should be entitled to qualified immunity as a matter of law. On April 9, 2024, the District Court entered an Order and Judgment granting Appellee's Renewed Motion for Judgment as a Matter of Law, finding that Appellees could not be held liable for a failure to train and failure to investigate if the officer who used the deadly force did not violate Keagan's rights, and vacating all verdicts entered against Appellees. ADD 1; APP 1398; R. Doc. 157.

On April 12, 2024, Appellants filed a timely Notice of Appeal. APP 1446; R. Doc. 160.

**Statement of Facts**

On October 17, 2016, Appellant Piper Partridge ("Piper") received a phone call from her son, Keagan's high school principal, Principal Chad Withers, at approximately 9 or 9:30 a.m. TR., Vol. 2, p. 197. Piper immediately got in her car and drove to Keagan's school. *Id.* Upon her arrival at the school, Piper was informed that Keagan had dozed off in class and that he was allegedly found with what was believed to be a bottle of codeine cough syrup in his pocket that he was accused to have ingested by the school. TR., Vol. 2, p. 198. Principal Withers informed Piper and Keagan that Keagan was suspended for ten (10) days and that he would potentially be recommending an expulsion. TR., Vol. 2, p. 199.

After leaving Keagan's school, Piper decided to take Keagan to the Children's Hospital to get Keagan help. TR., Vol. 2, p. 202. Realizing that she had left her wallet at home, Piper drove back home to retrieve it. *Id.* In the car on the way home, Keagan was distraught and insisted to his mom that he had been falsely accused, denying that he drank the cough syrup. TR., Vol. 2, p. 203. Piper testified at trial that after they returned home, Keagan was sobbing and saying "I have ruined my life. What's dad going to say? What's Poppa going to say?" TR., Vol. 2, p. 204. Keagan subsequently went downstairs and Piper heard the slide of a firearm. TR., Vol. 2, p. 205. Piper went looking for him and ultimately drove down to a nearby wooded area she believed he might have gone to. TR., Vol. 2, p. 206-

207. It was in this wooded area that Piper found Keagan. *Id.* As Piper tried to approach Keagan, he placed the firearm to his temple. TR., Vol. 2, p. 208. Fearing that her teenage son was going to harm himself, Piper called 911 seeking help. TR., Vol. 2, p. 209. Piper repeatedly informed the 911 dispatcher that Keagan had a firearm and that he was threatening to kill himself. APP 1126.[1] The dispatcher instructed Piper that she needed to "keep [Keagan] calm." *Id.* Piper told the first officer she spoke to about what had happened with Keagan earlier that morning and reiterated that Keagan "was a danger to himself and was going to kill himself." TR., Vol. 2, p. 212-213. Piper testified that no one at any time prior to Keagan's death spoke to her about a plan of action. TR., Vol. 2, p. 234.

At the request of Lieutenant Bigelow, Officer Ellison was dispatched to the scene to assist with his law enforcement K9 dog "Duko." TR., Vol. 3, p. 511, 513. At trial, Officer Ellison testified that the dispatcher "...gave me the address of 1206 River Oaks and stated that officers were on scene, suicidal juvenile ran off from home into the woods with a gun." TR., Vol. 3, p. 512. When asked if that was all the information he was supplied with, Officer Ellison stated "Yes, that was it." *Id.*

> Q. You know that he was suicidal, correct?
> A. Yes.
> Q. There was absolutely no indication that he was going to hurt someone else, was there? Nobody told you that, either the dispatcher, Bigelow, Speer, or Davidson, right?

---

[1] This is a digital exhibit admitted at trial, but not made available through the Court's docket.

A. No one said that, no.
TR., Vol. 3, p. 531.

At the time Officer Ellison encountered Keagan, he was accompanied by Detective Douglas Speer ("Detective Speer") and Lieutenant Ronald Davidson ("Lieutenant Davidson"), who were not provided with any instruction of what to do before or after reporting to the scene. TR., Vol. 3, p. 530-531; Vol. 4, p. 857; Vol. 5, p. 907. Detective Speer informed Officer Ellison upon their simultaneous arrival at the scene that he would serve as Officer Ellison's cover officer. TR., Vol. 4, p. 856-857. Lieutenant Davidson became one of Officer Ellison's cover officers when they unexpectedly encountered each other in the middle of the woods. TR., Vol. 5, p. 879. Believing that Duko may have tracked to Lieutenant Davidson in the woods, Officer Ellison restarted the track at the point he encountered Lieutenant Davidson. TR., Vol. 3, p. 531-532. Officer Ellison described the terrain as being "down steep hills and ravines, dry creek beds, and up steep hills." TR., Vol. 3, p. 619. At one point, Duko pulled Officer Ellison over a barbed-wire fence, causing Officer Ellison to fall on top of it tumbling. *Id.* Ellison testified that "the entire track was like that." *Id.* Lieutenant Davidson testified regarding the chaotic nature of the track:

A. At one point, we came across some barbed-wire fence that was along the riverbank, we had to try to get over that. And actually Ellison got tangled up in the fence and Duko was pulling on him and he wound up doing like a cartwheel over down into a washout. So we were making quite a bit of noise as we were going through, which is also not good if you're look for someone

8

with a firearm because you're making all of this noise, you're not moving very stealthy, it's not going to give you the advantage of being able to see the person you're looking for before you get to them."
TR., Vol. 5, p. 880.

Officer Ellison's cover officers were not able to keep up with the pace of Duko's track. TR., Vol. 3, p. 620. When Officer Ellison found Keagan shortly after, Duko was "jumping, lunging, barking," while Officer Ellison was "screaming commands" at Keagan. TR., Vol. 3, p 696. At about 12:27 PM, Officer Ellison reported that shots had been fired and the "suspect" was down. TR., Vol. 4, p. 657-658.

When asked if anyone gave Lieutenant Davidson a "plan of attack," Lieutenant Davidson stated "I just knew that I needed to be in the general area. And once I found officers there, that's when I looked for a job, looked for work to do." TR., Vol. 5, p. 907. Lieutenant Davidson testified that the three officers did not discuss any kind of plan for what they would do if they found Keagan. TR., Vol. 5, 914. Lieutenant Davidson and Officer Ellison did not stop to speak to Keagan's mother, Piper, to obtain information regarding Keagan's state of mind before beginning their respective searches. TR., Vol. 4, p. 473; Vol. 5, p. 908-909. When asked if he would have wanted more information, Davidson admitted that "more information is always better." TR., Vol. 5, p. 951.

At trial, Officer Ellison admitted that he never attempted to use any non-lethal force against Keagan, did not announce himself as being a Benton Police

Officer, and did not inform Keagan of his intent to shoot. TR., Vol. 3, p. 573-574.

Officer Ellison could not recall the last mental-health related training, beyond "on-the-job training," he participated in since the training he underwent as a rookie. TR., Vol. 3, p. 599-601. Officer Ellison admitted that part of the reason why he did not release his K9, Duko, was because he did not want Duko to get shot:

> Q. Remember a witness saying that you told them that the reason you didn't release Duko was you didn't want Duko to get shot?
> A. That was part of the list of reasons why you don't use a dog against someone that's holding a firearm, yes.
> Q. I didn't ask you that, did I? I just asked the question.
> A. Do I remember saying that? Yes, I do.
> Q. You said it, right?
> A. Yes, I did.
> Q. You didn't say that's one of the list of reasons. You just said the reason I didn't use the dog was because I didn't want him to get shot, right?
> A. I did list other reasons as well.
> Q. Was that what was testified to yesterday?
> A. It was my statement, not someone else's statement to make.
> Q. Did somebody -- well, I know. You have statements that vary over time, right?
> A. What is your question?
> Q. You thought killing Keagan was better than having Duko get shot?
> A. That is absolutely the furthest thing from the truth.
> Q. What?
> A. That is not true, no.
> Q. Okay. Well, that's why you didn't release him, right?
> A. No. That is not why.
> Q. You already said that to somebody prior to being in this courtroom, right?
> A. That's a list -- that's one of the reasons why I did not use my dog, yes.
> TR., Vol. 3, p. 574-575.

Lieutenant Terry Fuller testified that he was the only trained crisis negotiator that responded to the scene. TR., Vol. 2, p. 327-328. At the time of the shooting,

Lieutenant Fuller was approximately a thousand feet away, watching the incident through "little, small hunting binoculars." TR., Vol. 2, p. 301. Lieutenant Fuller never engaged in any crisis negotiation with Keagan prior to Ellison shooting and killing him. Fuller was never instructed on how to approach the situation and never heard any mention of a plan. TR., Vol. 2, p. 288-289. When asked if there was any discussion regarding what the officers planned to do when they reached Keagan and how they could disarm him, Lieutenant Fuller confirmed there was not. *Id.* He never heard the word "plan" or any mention of a mental health professional on October 17, 2016. TR., Vol. 2, p. 309. Lieutenant Fuller testified that had he been the person to find Keagan instead of Ellison, he would have tried to "talk to him as a human and ask what [he could] do to help him." TR., Vol. 2, p. 293. However, Lieutenant Fuller did testify as follows:

> A. I saw him stand up. He kind of turned back toward the river, squatted back down. I don't know if he was sitting on something or just squatting because there's a lot of vegetation between here and there. When he stood back up, I saw what looked like two splashes in the water and almost immediately heard three shots.
> Q. Heard after you saw the splashes in the water?
> A. Correct.
> Q. And when you say raising the hand, you didn't see him point at anybody any gun, correct?
> A. No, sir.
> Q. And you would -- would you say that from the time – how much time elapsed between when he stood up and when you saw the splashes in the water?
> A. I would have to just kind of guess. It was probably ten, 15 seconds.
> Q. Okay. And did you see anybody else near him?
> A. No, sir.

TR., Vol. 2, p. 302-303.

Current BPD Chief of Police, Scotty Hodges ("Assistant Chief Hodges"),
who was the Assistant Chief of Police at the time, testified that the BPD responded
to situations dealing with people struggling with their mental health "most days."
TR., Vol. 4, p. 750. Both Assistant Chief Hodges and Lieutenant Patrick Baker
("Lieutenant Baker") testified that they did not recall the BPD having a mental
health policy nor was mental health training required in October of 2016. TR., Vol.
4, p. 757, 815. When asked why a course on behavioral health that was available in
2016 would not have been required by BPD, Assistant Chief Hodges testified:

> A: The law did not mandate any training in mental health until August of
> 2017, and that law required several things for a police department to do.
> Would you like –
> Q. No, because I've got a question for you.
> A. Okay.
> Q. You need somebody to pass a law that you take mental health training,
> and you're saying that was 2017. You with me? Right?
> A. Yes, sir.
> Q. If I understood correctly, you said that mental health issues are something
> that Benton Police Department deals with every single day multiple times. Is
> that what you said to Ms. Adams when she was questioning you?
> A. I said it's -- I'm trying to think how I worded that. I said it is basically on
> a day-to-day deal, something to that effect. I'm not saying every day we do. I
> would believe most days we do.
> Q. I would -- you know, having spent time in Little Rock, I would say that
> every day you do.
> A. I would like to say that, but --
> Q. Right? Is there any -- is there -- have you walked downtown around here
> at any time?
> A. I've seen it, yes.
> Q. I mean, it's not unique to Little Rock.
> A. It's not.

Q. It's virtually every urban place, isn't it?

A. It is.

Q. That you walk around, and back in 2016 in some places it was even worse than it is today. Isn't that true?

A. I don't know the answer to that.

Q. Well, the -- what the mental health -- the criminal justice system, wouldn't you agree with me, has become basically, since the '80s, the first line of defense for the mental health issues in America?

A. I would -- I think that's accurate.

Q. I'm going to give you a statement. I have a friend who used to be the sheriff of LA county. He used to say he runs the largest mental health institution in the country. You know what that was? County jail. Do you disagree with the former sheriff?

A. I would not disagree with something he said.

Q. Right. Isn't it a fact -- how long have you been a police officer?

A. 27-and-a-half years.

Q. Okay. Not quite as old as me, but the -- wouldn't you say that all you got do is go over to the -- more so the state court than the federal court, but any given day in the state court back in 2016 and sit in a courtroom and maybe 80 percent of the people who are cycled through the justice system are somebody who's got a mental health issue, behavioral issue, substance abuse, or something along those lines. Isn't that a fair statement?

A. I wouldn't know the answer to that. I'm sorry.

Q. Well, wouldn't you say that you are the front lines of dealing with mental health?

A. Probably most of the time.

TR., Vol. 4, p. 749-752.

Assistant Chief Hodges testified that he was out of state at the time of the shooting and immediately started his trip back to Benton when he was informed of the incident, but stopped when he spoke with Chief Lane. TR., Vol. 4, p. 725-726. Assistant Chief Hodges testified that "[w]hile on the phone with Kirk Lane, he advised me that he wanted me to turn around and go back to the class and that they

had it handled." *Id.* Assistant Chief Hodges again reiterated what Chief Lane told

him on cross-examination:

> Q: And when you were called about this, you left whatever conference you
> were in but chief – now Chief Lane – or then Chief Lane told you, don't
> worry, we got it handled.
> A: Yes, sir.
> Q. That was how long after the shooting?
> A. I would be speculating.
> Q. I don't want you to speculate, but was it the same day as the shooting?
> A. It was.
> Q. Was it within -- was it within an hour?
> A. I would not think within an hour. I think my drive alone would have
> probably been an hour and a half and then I'd have to leave the class, talk to
> the instructor. So I would say within two hours of being notified.
> Q. And they already had it handled?
> A. It wasn't said -- it was like --
> Q. I'm using your words. That's what you -- didn't you tell the jury, we had it
> handled?
> A. That's not what I meant.
> Q. What?
> A. Not what I meant.
> Q. Does -- is there some -- when I ask questions -- I don't want to be a smart
> alec here, but why is it every time I ask an officer a question and I use their
> words, I'm then told, that's not what I meant?
> MS. ADAMS: Objection.
> BY MR. GERAGOS:
> Q. Do you have any explanation for that?
> THE COURT: He can ask. It's cross-examination. He can ask the question.
> BY MR. GERAGOS:
> Q. You know, milliseconds doesn't mean milliseconds. Have it handled
> doesn't mean have it handled. I'm a little frustrated by that. Can you
> understand that?
> A. No, sir.
> Q. Got it handled. You know what "got it handled" means to me? That
> means, don't worry, we're going to take care of this, we'll white wash it.
> Does -- is that a -- does "got it handled" mean something to you that's
> different in the English language?
> A. Yes, it does, obviously.

Q. "Got it handled" means -- you were the assistant chief, right?
A. Excuse me.
Q. Were you the assistant chief?
A. I was the assistant chief, yes.
Q. That means you were number two.
A. That is correct.
Q. And number one says, I got it handled, don't bother, you don't need to come back, we just we just killed a 17 year old who's mother -- you knew who his mother was, right?
A. I do know Piper.
Q. Did you know -- October 17, 2016, did you know Piper Partridge?
A. Did I know her as of that date?
Q. As of that date.
A. I knew her before that date, yes.
Q. So you knew her. Did you know when the chief called you, we just killed Piper's kid?
A. I would be speculating if I answer that. I'm not a hundred percent when I was told the identity.
Q. So you get a call, you're at -- was the conference on dealing with mental health issues?
A. It was a training class and it was not on dealing with mental health issues.
TR., Vol. 4, p. 742-745.

Assistant Chief Hodges denied having any involvement in the investigation

of Keagan's killing, despite the fact that Chief Lane falsely wrote in his notes that

Assistant Chief Hodges had reviewed the internal investigation reports:

A. I do not recall reviewing anything or having anything to do with the case. However, Kirk Lane wrote in his notes that I reviewed the IA. So do I – did I review the IA and I just don't remember? I'm not certain. I don't remember reviewing the IA.
Q. But he wrote in the notes that you did.
A. That's correct.
Q. But as you sit here the current chief, you have no memory of that.
A. I do not. That's correct.
TR., Vol. 4, p. 762-763.

Assistant Chief Hodges noted that "Kirk Lane would have ultimately been responsible for that whole investigation ultimately." TR., Vol. 4, p. 761-762.

Current Assistant Chief of Police, Jeff Besancon, testified that Chief Lane had the ability to turn the investigation over to the Arkansas state police, but made the decision to keep the investigation in-house instead. TR., Vol. 2, p. 331-333.

Detective Chris Benham ("Detective Benham"), who had been with the BPD for two years and in the criminal investigation unit for approximately only six months at the time of the incident, was appointed by Lane to handle the criminal investigation of Officer Ellison. TR., Vol. 3, p. 424-425. The first thing Detective Benham did the day after the shooting was dig for negative information from Keagan's past:

> Q. But you just acknowledged, you got 25 pages from Naples, Florida sheriff's department about some incident that related to what had happened with them three years earlier. You got that. That was the first thing you did the next day, wasn't it?
> A. Yes.
> TR., Vol. 3, p. 461-462.

When asked about former Chief Kirk Lane deciding to conduct the investigation in-house rather than turning it over to the state police, Detective Benham testified:

> Q. Can you understand how somebody in their position might would have thought that the state police should have investigated this incident?
> A. Absolutely.
> Q: But he made this decision, your boss at the time, Kirk Lane, said no, we're going to do it, didn't he?

A. I mean, that's the way all officer-involved shootings were handled at that time.

Q. Ever at Benton Police Department, you always investigate yourselves on officer-involved shootings?

A. To my knowledge, yes.

 TR., Vol. 3, p. 462.

During his investigation of Ellison killing 17-year-old Keagan, Detective Benham testified that he did not look into Officer Ellison's history, talk to his wife, or attempt to locate any of his friends:

Q. Did you investigate anything about Kyle Ellison's family? Did you talk to his wife about how he was thinking or anything related to this?

A. No, sir.

Q. Did you back to find friends of his, try to interview them –

A. No, sir.

Q. – about his shooting and killing Keagan Schweikle? You didn't do that did you?

A. No, sir.

TR., Vol. 3, p. 455-456.

Detective Benham focused his investigation on Keagan by obtaining records for an incident that had occurred three (3) years prior in a different state and interviewing his family, school staff, and ex-girlfriend. TR., Vol. 3, p. 440-441; 461. During the investigation of Officer Ellison, Piper Partridge was interviewed for over an hour and fifteen (15) minutes the day after the shooting. TR., Vol. 3, p. 461. Officer Ellison was interviewed ten (10) days after the incident for roughly ten (10) minutes. *Id.* Detective Benham stated that "depending on the circumstances," this was normal operating procedure. *Id.*

During trial, Piper testified that, since Keagan's death, she has been pulled

over numerous times by officers with the Benton Police Department:

> Q. I had asked you before, since Keagan's death, Benton PD, you had interactions with them?
> A. I have.
> Q. What kind?
> A. Well, roughly 20 to 24 times I've been pulled over in the last five or six years.
> Q. For what?
> A. They always said that they didn't show that I had insurance. I have been surrounded by cop cars at the AT&T store, police officer here, one here, one in the front, one in the back. They have harassed me so terribly that I had to move from my town.
>
> I mean, I pulled out of my driveway one day and there was one sitting on the block, right at that block. I said to my friend on the phone -- I was going to work. I said, there's one sitting there right, ten bucks says he pulls me over. He light them up. It get so bad that I would,literally, just pull over and hold my wallet out the window -- my driver's license.
> TR., Vol. 2, p. 236-237.

In response to Piper's testimony, current Police Chief Scotty Hodges

searched BPD's records for instances where Piper had been pulled over, but

testified that he could not find any records of the incidents:

> Q. You bring that up today because you went and you searched because you didn't know about all the instances of her being pulled over, did you?
> A. Nor could I find any. That's correct.
>  Q. You found four, didn't you?
> A. Not of Piper Partridge.
> Q. You found two and two of who and who?
> A. Two of Louis Partridge being stopped on a traffic stop and two of a Nicholas Partridge being stopped on a traffic stop. Nothing with Piper Partridge.
> Q. Did you -- by the way, are you saying that she's lying about that?
> A. I didn't say that. I said I couldn't find any.
> Q. You couldn't find it. Does that give you some pause?

A. Pause?

Q. Yeah. Does that give you some pause that she got up here and she swore under oath, she's been pulled over 22 times. And we know from Mr. Ellison that, when he was a trooper, he admits that he pulled her over, right? You heard that testimony.

A. I did hear that.

Q. So she wasn't making that up, right?

A. Correct, but --

Q. Okay. So I'm asking you. Do you think she made up the other 21 times?

A. I don't have an answer to that.

Q. But you couldn't find a record of it?

A. I could not.

Q. Do you have a policy about, when somebody files a lawsuit against your department, having officers keep track of interactions that they have with the person who's suing the department?

A. I do not have a policy on that.

Q. How long have you been the chief?

A. Six-plus years.

Q. So pretty much the entire time since this lawsuit has been filed you've been the chief.

A. Probably within a year after this incident, I became chief.

Q. And did you do anything to -- when did you first find out that Piper Partridge says that she was pulled over 22 times?

A. In this courtroom.

Q. And your -- and your -- when you heard that, that troubled you, didn't it?

A. Any time I hear something like that, I'm concerned.

Q. Why would you be concerned?

A. Because I want our department to be well-respected and have a good reputation. And if that's true, that's not what I want our department to be represented like.

Q. If that's true, that really doesn't look good, does it?

A. That's correct.

TR., Vol. 4, p. 753-755.

Lieutenant Baker was responsible for the internal affairs investigation of Officer Ellison. He testified that he did not have full knowledge of Officer Ellison's use of force history:

19

Q. Well, you talked a lot about minors and we've talked about minor policy, right? Right?

A. The missing juvenile policy?

Q. Yeah, missing juvenile policy, which says minor, right?

A. Yes, sir.

Q. Okay. Missing Persons. Can you tell me, did you look at a specific previous use of force by Ellison regarding a minor?

A. Not to my knowledge, no, sir. I don't know -- I don't know what you're referring to.

Q. Well, let me give you an example. If the investigation was looking at Keagan, mind you, which apparently it was, wouldn't you want to know if in less than a year prior to this in an incident involving a minor, that Ellison ignored the minor, started getting into it with him and had a problem with him less than ten months before than this incident? Would that have – did you even know about that?

A. No, sir, I did not know about that incident.

Q. So if the date of an incident was 12/30/2015 and Ellison had an issue with a minor on 12/30, December 30th, and he approached the minor, threw him to the ground and placed him under arrest and you had videos of the incident, patrol room videos, a case file, photos of the incident, wouldn't that have been something that if you're doing a thorough investigation, you might have wanted to take a look at? Maybe there's some issues with this guy and minors?

A. It would have been -- if I would have known about it, it would have been good to look at, yes.

Q. It certainly wouldn't hurt to look at, would it?

A. No, it would not.

TR., Vol. 4, p. 811-812.

As of October 17, 2016, the Missing Persons Policy had not been updated in nearly ten (10) years. TR., Vol. 4, p. 813-815. The BPD's policy on internal investigations was over twenty (20) years old. TR., Vol. 4, p. 817.

Lieutenant Baker testified that there was no professional standards investigation regarding a previous incident where Ellison shot a dog and hit himself:

Q. Did you do the internal investigation on Ellison for the Mosher incident in February?

A. There was not an internal investigation on the Mosher incident.

Q. Even though there was a shot fired, an officer injured and a dog killed, nobody did an internal investigation?

A. No, there was not an internal investigation on it.

Q. And you know that because that was your job at that point, correct?

A. Yes.

Q. So when somebody says that that use of force -- by the way, when a gun is discharged, that's a use of force, correct?

A. It could be, yes. By our policy, it is.

Q. So if somebody was representing to this jury that was unfounded or that use of force was okay, there was no investigation, you were the guy who would have done the investigation, right?

A. I would not have done the investigation on a dog being shot.

Q. How about on an officer being shot?

A. On an officer being shot, yes. But --

Q. Wasn't he shot?

A. I believe he may have been injured from the ricochet from the dog.

Q. Is that a shot?

A. Yes, sir, it is.

Q. Okay. There was no investigation?

A. No, sir, there was not a Professional Standards investigation.

TR., Vol. 4, p. 819-820.

According to Baker, Judge McAllister, a circuit court judge, notified Chief

Lane that he disapproved of the way the investigation was being shaped:

Q. Didn't -- specifically it says, Judge McAllister, in regards to concerns and a comment he made that we were trying to shape the investigation in a certain direction, he would not give us this information filed by the family because he did not believe it had anything to do with our case. That was your chief writing about what the judge said, right?

A. Yes, sir.

Q. That give you some pause that maybe what you were part of was a biased investigation?

A. No, sir, it did not.

Q. Okay. Well, a circuit court judge, you were -- you're in a -- you're part of an agency that is operating under state law, correct?

A. Correct.

Q. A circuit court judge is the judge that has jurisdiction in your county, correct?

A. Correct.

Q. Okay. And that is a neutral person, right?

A. Yes, sir.

Q. And this neutral person believes that your department, your chief, is shaping the investigation; is that right?

A. I guess in asking for the FINS petition, that would have been his opinion.

Q. You don't guess. That's what your chief wrote down in a report.

A. Correct.

Q. Anywhere in your findings did you put that?

A. I did not put that in my findings.

TR., Vol. 4, p. 805-806.

Officer Ellison had twelve (12) use of force incidents in the five (5) years prior to this incident, including incidents involving a minor and deaths of both animals and people. TR., Vol. 3, p. 568-570. Officer Ellison shot and killed another person in 2013. *Id.* In February 2016, eight months prior to the incident at issue here, Officer Ellison shot a dog that was biting his leg through the top of its head and hit himself with the bullet. TR., Vol. 3, p. 570-571. Officer Ellison underwent training as a K9 handler in January 2016. TR., Vol. 4, p. 670. Officer Ellison had another incident in which he shot and killed a dog. TR., Vol. 3, p. 569.

The Benton Police Department ("BPD") internally investigated Officer Ellison's twelve (12) documented use of force incidents, clearing him each time. TR., Vol. 3, p. 569. Each incident was found to be within policy or justified. *Id.*

## STANDARD OF REVIEW

The appellate standard of review for a ruling on a motion for judgment as a matter of law (JMOL) is de novo. *Soltesz v. Rushmore Plaza Civic Ctr.,* 847 F.3d 941, 945 (8th Cir. 2017); Fed. R. Civ. P. 50. The appellate court applies the same standard as the district court and views the evidence in the light most favorable to the party who prevailed at the trial court level. *Id.* In reviewing a jury verdict, the reviewing court draws every reasonable inference in favor of the verdict and may not make credibility determinations or weigh the evidence. *Id.* citing *Chen v. Mukasey,* 510 F.3d 797, 801 (8th Cir. 2007). The jury's verdict will not be set aside unless there is a complete absence of probative facts to support the verdict. *Wilson v. Brinker Int'l, Inc.,* 382 F.3d 765, 769 (8th Cir. 2004). Judgment as a matter of law is appropriate only if no reasonable jury could have found for the non-moving party based on the evidence presented. *Soltesz,* 847 F.3d, at 941. In considering Appellants' position that the trial court erred by granting Defendant-Appellees motion for judgment as a matter of law, the Appellate Court must: (1) consider the evidence in the light most favorable to Plaintiff-Appellant; (2) assume all conflicts in the evidence were resolved in Plaintiff-Appellants' favor; (3) assume Plaintiff-Appellant proved all facts that their evidence tended to prove; and (4) give Plaintiff the benefit of all favorable inferences that reasonably

may be drawn from the proven facts. *Morse v. S. Union Co.,* 174 F.3d 917, 922 (8th Cir.1999).

## SUMMARY OF THE ARGUMENT

The district court erred in granting Defendants-Appellees Motion for Judgment a Matter of Law (JMOL).  In ruling in favor of defendants, the district court incorrectly ruled Appellees the City of Benton and former police chief Kirk Lane, could not be held liable for failing to adequately train their officers or for failing to adequately investigate prior accusations of excessive force absent a finding by the jury that Kyle Ellison, the officer who used deadly force, violated Keagan's constitutional rights.  The district court's two-page ruling purportedly relies on the United States Supreme Court decision in *City of Los Angeles v. Heller*, 475 U.S. 796, (1986), but ignores clear Eighth Circuit law regarding municipal and individual liability in the Section 1983 context.  Specifically, in *Speer v. City of Wynne, Arkansas*, 276 F.3d 980, 986 (8th Cir. 2002), the Eighth Circuit held *Heller* should not be interpreted as creating a broad rule requiring automatic dismissal of claims against the municipality or chief of police in every case where the defendant officer was not a constitutional violator.  Instead, a city and its policy makers may be held liable for failure to train and failure to investigate prior accusations of excessive force even if the officer who used deadly force was not held liable for violating the complainant's Constitutional rights,

24

when there is clear evidence of a pattern of constitutional violations or deliberate indifference. *Rogers v. City of Little Rock, Ark.,* 152 F.3d 790, 798–99 (8th Cir. 1998). However, the district court order has no analysis of liability on the part of the City of Benton or Kirk Lane under the necessary deliberate indifference standard. It abruptly concludes that this analysis was 'beside the point,' and erroneously vacated the jury's verdict.

## ARGUMENT

### I. THE TRIAL COURT ERRED IN GRANTING DEFENDANTS-APPELLEES MOTION FOR JUDGMENT AS A MATTER OF LAW (JMOL) SETTING ASIDE THE JURY'S VERDICT IN FAVOR OF PLAINTIFFS-APPELLANTS.

A motion for judgment as a matter of law presents a legal question to the trial court, the question of whether there is sufficient evidence to support a jury verdict. *Hyatt v. Robb,* 114 F.3d 708, 711 (8th Cir.1997). The court's review of the jury's verdict is extremely deferential and the court cannot grant the motion unless the court concludes that no reasonable juror could have returned a verdict for the non-moving party. *Morse v. S. Union Co.,* 174 F.3d 917, 922 (8th Cir.1999). In order to prevail on a motion for judgment as a matter of law, a defendant "has the difficult task of demonstrating that all the evidence points in [his] direction and is susceptible of no reasonable interpretation sustaining [the plaintiff's] position." *Morse,* 174 F.3d at 922.

The Court's decision relied on *City of Los Angeles v. Heller*, 475 U.S. 796, (1986) and based its decision on the erroneous premise that the City and Lane cannot be held liable unless the jury also returned a verdict against Kyle Ellison. The trial court gave no credence to Kirk Lane's individual liability and the jury's finding of Lane and the City's deliberate indifference, let alone Eighth Circuit case law. The trial court, citing *Heller*, concluded its decision that in fact, departmental regulations that might have authorized the use of constitutionally excessive force is "quite beside the point." This language from the district court's Order shows the court did not give extreme deference to the jury's verdict or consider the evidence in the light most favorable to Plaintiffs. As detailed in Appellants' brief, Eighth Circuit case law has in fact established that a city and its policy makers may be held liable for failure to train and failure to investigate prior accusations of excessive force even if the officer who used deadly force was not held liable for violating the complainant's Constitutional rights, when there is clear evidence of a pattern of constitutional violations or deliberate indifference. *Rogers v. City of Little Rock, Ark.,* 152 F.3d 790 (8th Cir. 1998); *Clay v. Conlee*, 815 F.2d 1164 (8th Cir. 1987); *Speer v. City of Wynne, Arkansas*, 276 F.3d 980 (8th Cir. 2002), *Tilson v. Forrest City Police Dep't*, 28 F.3d 802 (8th Cir. 1994), *Ottman v. City of Indep., Mo.,* 341 F.3d 751 (8th Cir. 2003). The trial court's order however simply concluded that this analysis was 'beside the point,' and erroneously vacated

the jury's verdict. [*Livers v. Schenck,* 700 F.3d 340, 356 (8th Cir. 2012) "Without guidance from the district court on what facts and assumptions it relied upon for its decision, we undertook the "cumbersome review of the record to determine what facts the district court, in the light most favorable to the nonmoving part[ies], likely assumed."]

The District Court literally invited the jury by its instructions and verdict forms to find each count separately and distinctly from one another. The jury did just that. The District Court for the third time gutted this case and ignored the Eighth Circuit and its law.

>  **A.** ***The City of Benton and Chief Lane (in his official and individual capacity) can be held liable for failing to adequately train its officers and for failing to adequately investigate prior accusations of excessive force even if the officer who used deadly force against Keagan Schweikle was not held liable for violating Keagan's Constitutional Rights.***

*Monell* requires that in order to establish Section 1983 liability against a municipality, Appellant must show that there was a "policy or custom of failing to act upon prior similar complaints of unconstitutional conduct, which caused the constitutional injury at issue." *Rogers v. City of Little Rock, Ark.,* 152 F.3d 790, 798–99 (8th Cir. 1998) (quoting *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 694 (1978)). A city may also be liable under § 1983 where there had been a prior pattern of unconstitutional conduct that was so persistent and

widespread as to have the effect and force of law," and the pattern caused the alleged injury. *Monell*, 436 U.S. at 691. Under this theory of liability, a plaintiff must show "that city officials had knowledge of prior incidents of police misconduct and deliberately failed to take remedial action." *Rogers*, 152 F.3d at 799 (8th Cir. 1998)(citations omitted).

The United States Supreme Court decision in *City of Los Angeles v. Heller*, 475 U.S. 796, (1986) does not preclude liability against the city and Kirk Lane in this case as a result of the jury not rendering a verdict against Kyle Ellison. In *Heller*, after the jury returned a verdict in favor of the officer in the first part of the bifurcated trial, the trial court dismissed against the city, consequently never allowing the jury an opportunity to hear evidence against the municipality as the court assumed it would be inconsistent. The Supreme Court upheld the dismissal, reasoning that the municipal defendants' alleged liability stemmed from their legal responsibility for the officer's conduct and that a finding that the officer's conduct was not unconstitutional obviated any possibility that the municipal defendants were subject to liability. *Id.* at 799. This is hardly the factual or legal circumstance here.

In the instant matter, the jurors found constitutional liability against Kirk Lane pursuant to a deliberately indifferent standard, finding that his deliberate indifference and conscious choice(s) and inaction directly resulted in Keagan's

injury. The jury heard overwhelming evidence regarding the City and Lane's failure to adequately train their officers; they had no training about mentally unstable subjects, they had inadequate K9 dog training, and no investigative standards for incidents of police officer use of force. Keagan's tragic, unnecessary death and cover up by Benton Police Department's so-called internal investigation was on full display for the jury.

In *Speer v. City of Wynne, Arkansas*, 276 F.3d 980 (8th Cir. 2002), the Eighth Circuit citing *Praprotnik*, explained that "a crucial fact underlying the Supreme Court's decision in *Heller* was that the theory of municipal liability asserted was entirely dependent on the municipal defendants' responsibility for the officer's alleged unconstitutional acts." *Speer v. City of Wynne, Arkansas*, 276 F.3d 980, 986 (8th Cir. 2002). In footnote number 2, of the *Speer* opinion, the Eighth Circuit quoting *Martin A. Schwartz & John E. Kirklin, Section 1983 Litigation: Claims, Defenses, and Fees* § 7.6 (2d ed. 1991), wrote "*Heller* ... should not be read as announcing a broad rule requiring dismissal of the claim against the municipality in every case in which it is found that the defendant officer was not a constitutional violator." *Id.* at 986, FN 2. The Eighth Circuit in *Speer* went on to state "*Heller* should not be read to require a plaintiff to show more than that a governmental policy or custom was the 'moving force' that led to the deprivation of his constitutional rights, the foundation for municipal liability recognized by the

Court in *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694, (1978)." *Id.* at 986. *Speer* explains instead that the appropriate question under *Heller* is whether a verdict or decision exonerating the individual governmental actors can be harmonized with a concomitant verdict or decision imposing liability on the municipal entity. *Id.*

A Section 1983 action against a government official in his official capacity, is "tantamount to an action directly against the public entity of which the official is an agent." *Clay v. Conlee*, 815 F.2d 1164, 1169–70 (8th Cir. 1987). A suit against the official in his official capacity requires the plaintiff to prove more than that his constitutional rights were violated by the named individual defendant, "for a governmental entity is liable under § 1983 only when the entity itself is a 'moving force' behind the violation." *Id.* Meaning, that the entity's official "policy or custom" must have "caused" the constitutional violation, "there must be an 'affirmative link' or a 'causal connection' between the policy and the particular constitutional violation alleged." *Id.*

By contrast, a municipal employee faces Section 1983 liability in his individual capacity when he fails to act adequately on complaints if he had notice of a pattern of unconstitutional conduct by subordinates and displayed deliberate indifference to or tacit authorization of the conduct. *Rogers*, 152 F.3d at 800. "To

impose supervisory liability, other misconduct must be very similar to the conduct giving rise to liability." *Livers v. Schenck,* 700 F.3d 340, 356 (8th Cir. 2012).

The Eighth Circuit's opinion in *Clay v. Conlee*, 815 F.2d 1164, 1169 (8th Cir. 1987), discusses the legal standard required for supervisor liability. *Clay*, 815 F.2d at 1169–70. *Clay* explains to establish personal liability in a 1983 action, the plaintiff must show that the official, acting under color of state law, "caused the deprivation of a federal right." *Id.* at 1170. The Court explained "[t]hough personal participation is not required for liability to attach...there is no concept of 'supervisory strict liability' in § 1983 actions...Instead, for a supervisor to be held liable for the acts of a subordinate, something more must be shown than merely the existence of the supervisor-subordinate relationship." *Id.* (internal citations omitted). The Eighth Circuit citing *Hahn v. McLey*, 737 F.2d 771, 773 (8th Cir.1984) explained that a "supervisor may be liable for the acts of a subordinate if injury is inflicted upon the plaintiff as a result of a breach of the supervisor's duty to train, supervise, or control the actions of subordinates." *Id.* "...[W]e simply wish to make the point that, when supervisory liability is imposed, it is imposed against the supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates." *Id.*

Failure to act theories, including failure to investigate, failure to train, supervise or discipline - all theories the jurors were instructed on – abide by the

notion that "inaction or laxness can constitute government custom if it is permanent and well settled" and the inaction is "the moving force behind the constitutional violation." *Tilson v. Forrest City Police Dep't*, 28 F.3d 802, 807 (8th Cir. 1994). In a failure to act theory, the question is whether the pattern of custom led officers to believe that they could violate citizens' constitutional rights without fear of punishment. *Rogers*, 152 F.3d at 799. A policy or custom of failing to act upon prior similar complaints of unconstitutional conduct is necessary under failure to act theories to establish causation. *Rogers*, 152 F.3d at 798. In *Mettler v. Whitledge,* 165 F.3d 1197, 1205 (8th Cir. 1999) this circuit explained that "[e]vidence that a police department has failed to investigate previous incidents similar to the incident in question may support a finding that a municipal custom exists, and that such a custom encourages or allows officers to use excessive force without concern for punishment."

The appropriate standard for liability for failure to train police officers is deliberate indifference. *Tilson v. Forrest City Police Dep't,* 28 F.3d 802, 806–07 (8th Cir. 1994). (*citing City of Canton v. Harris*, 489 U.S. 378, 388 (1989). In *City of Canton v. Harris*, 489 U.S. 378, (1989) the United States Supreme Court held that inadequate police training may serve as the basis for a section 1983 liability "where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact ... Only where a failure to train

reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by our prior cases—can a city be liable for such a failure under § 1983 ... Moreover, for liability to attach in this circumstance the identified deficiency in a city's training program must be closely related to the ultimate injury." *Abbott v. City of Crocker, Mo.*, 30 F.3d 994, 998–99 (8th Cir. 1994) (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388–389 (1989).)

Accordingly, for a supervisor to have violated a plaintiff's constitutional rights by failing to train or supervise, or by failing to adequately receive, investigate, or act upon complaints of misconduct, it must be shown that the supervisor: (1) Received notice of a pattern of unconstitutional acts committed by subordinates; (2) Demonstrated deliberate indifference to or tacit authorization of the offensive acts; (3) Failed to take sufficient remedial action; and (4) That such failure proximately caused injury to Plaintiffs. *Andrews v. Fowler*, 98 F.3d 1069, 1078 (8th Cir. 1996). To establish deliberate indifference, a plaintiff must ordinarily demonstrate a pattern of constitutional violations. *Perkins v. Hastings*, 915 F. 3d 512 (8th Cir. 2019).

The Eighth Circuit has found that "a supervisor incurs liability for a violation of a federally protected right when the supervisor is personally involved in the violation or when the supervisor's corrective inaction constitutes deliberate indifference toward the violation." *Ottman v. City of Indep., Mo.,* 341 F.3d 751,

761 (8th Cir. 2003) (citing *Choate v. Lockhart*, 7 F.3d 1370, 1376 (8th Cir.1993).) (emphasis added). Specifically, the Court held that in this circumstance "[t]he supervisor must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what [he or she] might see." *Id.* at 761 (citations omitted). "[A] supervisor can act with 'deliberate, reckless indifference' even when [s]he does not act 'knowingly.'" *Kahle v. Leonard*, 477 F.3d 544, 551–52 (8th Cir. 2007). "A supervisor can be found liable under § 1983 for deliberate indifference if [s]he is aware of 'a substantial risk of serious harm,' even if [s]he is not aware that the harm has, in fact, occurred." *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 842, (1994)). An official's position as a supervisor does not shield them from 1983 liability. *Wagner v. Jones*, 664 F.3d 259, 275 (8th Cir. 2011) [holding that the district court erred in finding that qualified immunity protects Dean Jones from liability in her individual capacity.]

Here, as to former chief Kirk Lane, the jury found that (a) Lane deprived Keagan of his constitutional rights through his deliberate indifference in failing to train his subordinates which the jury determined reflected a conscious and deliberate choice by Lane that directly caused Keagan's injury and death; and (b) Lane deprived Keagan of his constitutional rights and was deliberately indifferent through his inadequate investigation procedures and failure to investigate prior accusations of excessive force demonstrating his deliberate indifference and

reflecting a conscious choice by Lane causing Keagan to be shot and killed as a result.  APP 1284-1285; R. Doc. 144, at 17-18.

The Court's jury instructions explained to the jury that in order to sustain their claims against the City of Benton, Plaintiffs had the burden of proving by a preponderance of the evidence, "that Keagan Schweikle was **deprived of his constitutional rights** because of a City custom, policy, ordinance, regulation, or decision." APP 1282-1283; R. Doc. 144, at 15-16. The Court's Instruction Number 12 went on to specify that Plaintiffs had advanced two theories in support of this claim, (1) failure to train, and (2) failure to investigate. *Id.* Significantly, Defendants did not object to the language provided by the Court's instructions as to the City of Benton or Kirk Lane.  The jury returned a verdict on the theory that former Benton Police Chief Kirk Lane and the City of Benton, through their deliberate indifference and conscious choice not to adequately investigate Officer Ellison's prior use of excessive force, and through a deliberate and conscious choice not to adequately train City of Benton police officers, "directly" caused Keagan's injury and death, depriving him of his constitutional rights.

The jurors were not asked to respond to special interrogatories of any kind, and the Defendants declined any opportunity.  While the jurors did not hold Officer Ellison liable for causing Keagan's death, based on the structure of the verdict, the jurors believed Keagan was the subject of excessive force, but found

the former chief Lane and the City liable for their deliberate indifference to Officer Ellison's prior conduct, use of excessive force, lack of training, and the lack of a plan. The jurors were instructed to individually make a finding that Lane's deliberate indifference, conscious choices, and failure to train his subordinates **<u>directly</u>** caused Keagan's injury and death and deprived Keagan of his constitutional rights. The instructions the Court provided the jury as to Kyle Ellison did not include language regarding deprivation of Keagan's constitutional rights. The jury was only instructed to make constitutional deprivation findings as to the City and Kirk Lane in the Court's instructions 12 and 13. As to both, the jurors found that the City and Lane's deliberate indifference and conscious choices were the direct cause of Keagan being shot by Ellison and his resulting immediate death.

The jury did not consider a respondeat superior instruction nor did the Court's Instructions provide any such language. Instead, the jury found Kirk Lane liable in his individual and official capacity for his own personal action and inaction.

### B. The jury had a legally sufficient evidentiary basis to find Defendants City of Benton, Arkansas and Kirk Lane, in his official and individual capacity, liable for Plaintiffs' failure train and failure to investigate claims

The jury was instructed to consider the following elements to sustain a Plaintiffs-Appellants' claims against Kirk Lane and the City for depriving Keagan

of his constitutional rights because of a City of Benton custom, policy, ordinance, regulation, or decision that was instituted by Lane. APP 1282-1285; R. Doc. 144, at 15-18. The jury was presented with legally sufficient evidence to hold both liable on each claim, and did return a verdict in favor of Plaintiffs, awarding thirty million dollars in damages against the City and two-million dollars in damages against Kirk Lane to Plaintiffs.

### 1. Failure to Investigate Prior Use of Excessive Force

To prove that Keagan was deprived of his rights as a result of Lane's failure to investigate prior incidents of police abuse, plaintiffs had the burden of proving each of the following elements by a preponderance of the evidence:

> First, Lane's investigation procedures were inadequate;
>
> Second, Lane was deliberately indifferent in failing to investigate situations involving alleged uses of excessive force, such that the failure to investigate these situations reflects a deliberate or conscious choice by Lane; and
>
> Third, as a direct result, Schweikle was injured.

*The jury was instructed to consider the same elements as to the City of Benton.* APP 1282-1283; R. Doc. 144, at 15-16.

The jurors in this case were presented with overwhelming evidence regarding former Chief Lane's lack of investigative procedures and his deliberate

indifference to situations involving use of excessive force. The jury determined that Lane "turned a blind eye" and condoned Ellison's repeated use of excessive force.

The jury heard evidence from Ellison's extensive prior use of force file, which included multiple killings of humans and dogs. Officer Ellison had twelve (12) use of force incidents within five (5) years prior to killing Keagan. One of those incidents involved a minor. TR., Vol. 3, p. 568-570. Officer Ellison shot and killed another person in 2013. *Id.* In February 2016, eight months prior to this incident, Officer Ellison shot a dog who was biting his leg through the top of its head and hit himself. TR., Vol. 3, p. 570-571. Officer Ellison had undergone training as a K9 handler just a month prior in January 2016. TR., Vol. 4, p. 670. In addition to the February 2016 incident, Officer Ellison had another incident in which he shot and killed a dog. TR., Vol. 3, p. 569.

Lieutenant Baker testified that as to at least one firearm discharge incident involving Ellison, the BPD did not even initiate a professional standards investigation to look into it even though the incident would have been considered a use of force incident according to the BPD's policy. TR., Vol. 4, p. 819-820.

The investigation procedures instituted by Kirk Lane which the jury heard also was the manner in which Keagan's death was subsequently investigated by the BPD. It was evident that the BPD focused its investigation on clearing Ellison of

any fault or liability rather than on accountability. The jury heard the testimony of the current Assistant Chief of Police, Jeff Besancon, that Kirk Lane had the option of allowing the Arkansas State Police investigate use of force incidents, as an independent third-party, but Lane made the decision to keep this investigation and investigation of Ellison's prior use of force incidents in-house instead. TR., Vol. 2, p. 331-333.

Lane turned the investigation of this case over to Detective Chris Benham who had been in the criminal investigation unit for only six months at the time of the incident. TR., Vol. 3, p. 424-425. Detective Benham investigated Keagan's past rather than investigate Ellison. Benham engaged in a campaign to smear Keagan and sully his mother. His initial action was to seek a law enforcement report from Naples, Florida involving Keagan from three-years earlier. TR., Vol. 3, p. 461-462. Benham interviewed Keagan's family, school staff, and even Keagan's ex-girlfriend. TR., Vol. 3, p. 440-441; 461. He interrogated Piper Partridge for over an hour and fifteen minutes the day after Ellison killed her teenage son. TR., Vol. 3, p. 461. Meanwhile, Benham interviewed Ellison for a total of roughly ten minutes fully ten days after the incident. *Id.* Detective Benham stated that "depending on the circumstances," this was normal operating procedure within the BPD under former chief Lane's policies, which further displays the history of deliberate indifference. *Id.*

Lieutenant Baker testified that he was responsible for the internal affairs investigation of Ellison's killing of Keagan. He testified that he did not have full knowledge of Officer Ellison's use of force history at the time of his investigation. Lieutenant Baker had no idea that in fact Ellison had a prior use of force incident involving another minor within a year of him killing Keagan:

> Q. Well, let me give you an example. If the investigation was looking at Keagan, mind you, which apparently it was, wouldn't you want to know if in less than a year prior to this in an incident involving a minor, that Ellison ignored the minor, started getting into it with him and had a problem with him less than ten months before than this incident? Would that have – did you even know about that?
>
> A. No, sir, I did not know about that incident.
>
> Q. So if the date of an incident was 12/30/2015 and Ellison had an issue with a minor on 12/30, December 30th, and he approached the minor, threw him to the ground and placed him under arrest and you had videos of the incident, patrol room videos, a case file, photos of the incident, wouldn't that have been something that if you're doing a thorough investigation, you might have wanted to take a look at? Maybe there's some issues with this guy and minors?
>
> A. It would have been -- if I would have known about it, it would have been good to look at, yes.
>
> Q. It certainly wouldn't hurt to look at, would it?
>
> A. No, it would not.
>
> TR., Vol. 4, p. 811-812.

As to the incident where Officer Ellison shot a dog and was hit in the leg by ricocheting bullet, there was no professional standards investigation regarding the incident:

Q. Did you do the internal investigation on Ellison for the Mosher incident in February?

A. There was not an internal investigation on the Mosher incident.

Q. Even though there was a shot fired, an officer injured and a dog killed, nobody did an internal investigation?

A. No, there was not an internal investigation on it.

Q. And you know that because that was your job at that point, correct?

A. Yes.

Q. So when somebody says that that use of force -- by the way, when a gun is discharged, that's a use of force, correct?

A. It could be, yes. By our policy, it is.

Q. So if somebody was representing to this jury that was unfounded or that use of force was okay, there was no investigation, you were the guy who would have done the investigation, right?

A. I would not have done the investigation on a dog being shot.

Q. How about on an officer being shot?

A. On an officer being shot, yes. But --

Q. Wasn't he shot?

A. I believe he may have been injured from the ricochet from the dog.

Q. Is that a shot?

A. Yes, sir, it is.

Q. Okay. There was no investigation?

A. No, sir, there was not a Professional Standards investigation.

TR., Vol. 4, p. 819-820.


Baker testified that at the time of the October 17, 2016 incident, the "Missing Persons Policy" he consulted had not been updated in nearly ten (10) years but was updated after Ellison shot and killed Keagan. Vol. 4, p. 813-815. Meanwhile, the BPD's policy on internal investigations was over twenty (20) years old at the time of Baker's investigation of Officer Ellison. Vol. 4, p. 817.

Meanwhile, former assistant BPD Chief Hodges, testified that he in fact had no involvement whatsoever in the investigation of Keagan's killing. It was revealed during his testimony that former chief Lane falsely wrote in his notes that assistant chief Hodges had reviewed the internal investigation reports regarding the incident. TR., Vol. 4, p. 762-763. At the time of his trial testimony, Hodges had no memory or knowledge of reviewing the investigation reports, despite Lane's false report. Hodges testified that "Kirk Lane would have ultimately been responsible for that whole investigation ultimately." TR., Vol. 4, p. 761-762. Current Assistant Chief of Police, Jeff Besancon, testified that Chief Lane had the authority to turn the investigation over to the Arkansas state police, but made the decision to keep the investigation in-house instead. TR., Vol. 2, p. 331-333. When asked about former Chief Kirk Lane deciding to conduct the investigation in-house rather than turning it over to the state police, Detective Benham testified that, to his knowledge, all officer-involved shootings historically were handled in-house under Chief Lane's policies. TR., Vol. 3, p. 462.

The evidence presented at trial demonstrated a legally sufficient, if not overwhelming, basis for the jury to find a pattern of constitutional violations premised on the deliberate indifference by former Chief Lane.

## 2.    Failure to Train

To prove that Keagan was deprived of his rights as a result of Lane's *failure to train* his police officers, plaintiffs had the burden of proving each of the following elements by a preponderance of the evidence:

First, Lane's training practices were inadequate; and

Second, Lane was deliberately indifferent in failing to train his subordinates, such that the failure to train reflects a deliberate or conscious choice by Lane; and

Third, as a direct result, Schweikle was injured.

*The jury was instructed to consider the same elements as to the City of Benton.* APP 1282-1283; R. Doc. 144, at 15-16.

The evidence presented surrounding the BPD officers' attempt to locate Keagan depicted a chaotic scene, with the chaos being entirely generated by the lack of plan of action or strategy on the part of the BPD officers.

Following Piper's 911 call reporting her missing teenage son, several officers were deployed to the wooded area Piper described last seeing her son. Detective Douglas Speer ("Detective Speer") and Lieutenant Ronald Davidson ("Lieutenant Davidson") testified that they were not given any instruction of what to do before or after reporting to the scene. TR., Vol. 3, p. 530-531; Vol. 4, p. 857; Vol. 5, p. 907. Lieutenant Davidson testified "I just knew that

I needed to be in the general area. And once I found officers there, that's when I looked for a job, looked for work to do." TR., Vol. 5, p. 907. Lieutenant Davidson testified that the three officers did not discuss any kind of plan for what they would do if they found Keagan. TR., Vol. 5, 914. Even though Piper was present and available to provide information and detail Keagan's whereabouts, the officers did not bother to stop and speak to her. TR., Vol. 4, p. 473; Vol. 5, p. 908-909. Davidson conceded that "more information is always better." TR., Vol. 5, p. 951.

Officer Ellison, who shot Keagan multiple times within seconds of spotting Keagan, testified that he made no attempt to use non-lethal force. TR., Vol. 3, p. 573-574. In fact, Ellison prioritized keeping his K9 dog unharmed over keeping Keagan alive. TR., Vol. 3, p. 574-575. Ellison described being pulled by his dog Duko through the uneven terrain and losing his footing falling over a barbed-wire fence as a result. TR., Vol. 3, p. 619. Lieutenant Davidson testified that Ellison "got tangled up in the fence and Duko was pulling on him and he wound up doing like a cartwheel over down into a washout." TR., Vol. 5, p. 880. Ultimately, when Officer Ellison located Keagan, Duko the K9 was "jumping, lunging, barking," while Officer Ellison was "screaming commands" at Keagan. TR., Vol. 3, p. 696. It was apparent that Ellison, who only received his K9 training months earlier, had little or no control over Duko during his search for Keagan.

Officer Ellison had no information about Keagan, why Keagan was in the peril that he was in, or the purpose of Piper's 911 call, let alone his own purpose for being there. After shooting and killing Keagan, at approximately 12:27 PM, Officer Ellison reported that shots had been fired and called 17-year-old Keagan a "suspect." TR., Vol. 4, p. 657-658. Until his encounter with Keagan on October 7, 2016, Ellison could not recall receiving any mental health training from the BPD, despite being previously deployed to locate an allegedly suicidal teenager. TR., Vol. 3, p. 599-601.

The jury heard Lieutenant Terry Fuller's testimony, Fuller was the only trained crisis negotiator that responded to the area. TR., Vol. 2, p. 327-328. Lieutenant Fuller testified that at the time of the shooting, he was watching the incident through "little, small hunting binoculars." TR., Vol. 2, p. 301. Fuller testified that he was not instructed on how to approach the situation and never heard any mention of a plan or strategy. TR., Vol. 2, p. 288-289. He never heard the word "plan" or any mention of a mental health professional on October 17, 2016. TR., Vol. 2, p. 309. Significantly, Lieutenant Fuller testified that had he been the person to find Keagan instead of Ellison, he would have tried to "talk to him as a human and ask what [he could] do to help him." TR., Vol. 2, p. 293.

Both Assistant Chief Hodges and Lieutenant Patrick Baker ("Lieutenant Baker") testified that they did not recall the BPD having a mental health policy nor

was mental health training required in October of 2016. TR., Vol. 4, p. 757-758; 815. This was despite the jury hearing testimony that BPD officers encountered subjects with mental health issues on a daily basis. TR., Vol. 3, p. 599-601; Vol. 4, p. 750.

In sum, the jury heard the story of a group of officers that responded to a 911 call from a concerned mother worried about her suicidal teenage son. In response, the BPD deployed a group of officers and a dog, without providing sufficient details, a plan or strategy. Ellison, clearly frustrated at the situation BPD placed him in, shot and killed 17-year old Keagan whom he believed to be a "suspect."

The jury indisputably heard legally sufficient evidence regarding Plaintiffs' failure to train claims against Kirk Lane and the City of Benton.

In *Perkins v. Hastings*, 915 F.3d 512 (8th Cir. 2019) for instance, this Court found that the police chief was not liable under Section 1983 for failing to adequately train or supervise an officer because there was no evidence that the police chief ignored obvious needs for training that were likely to result in constitutional violations. In *Szabla v. City of Brooklyn Park, Minnesota,* 486 F.3d 385 (8th Cir. 2007), mere allegations that a city failed to train its police adequately without showing that this inadequacy was a product of deliberate or conscious choice by city policymakers were insufficient to establish municipal liability. Here, Kirk Lane ignored and deliberately turned a blind eye to the

obvious need for (a) more adequate training of his police officers; and (b) more reliable and sufficient investigation of prior use of force incidents. The jury heard evidence that Lane not only deliberately disregarded the need for better training and reliable investigations, but also personally participated in falsifying investigation reports, and being personally responsible for implementing a system of biased investigations, diabolically designed to clear BPD police officers of wrong-doing. Inevitably, Kyle Ellison, who previously shot and killed multiple people and animals while on duty, believed he had a license to discharge his firearm with impunity. Lane's actions and inactions were undeniably the moving force behind Keagan's injuries, death, and constitutional violations.

### 3. Municipal Liability

Inadequate police training may serve as the basis municipal liability under § 1983 where the "failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989). Such a failure to train may rise to the level of a city "policy or custom" that is actionable under § 1983. A claim against a municipality for failure to train requires a showing that (1) the city's training practices are inadequate; (2) the city was deliberately indifferent to the rights of others in adopting them such that the failure to train reflects a deliberate or conscious choice by the municipality; and (3) an alleged deficiency in the city's training procedures

actually caused Keagan's injury. *Andrews,* 98 F.3d at 1076. Here, the inadequate training specifically pertains to officers' handling of situations involving those in a mental health crisis, which employees of the City of Benton acknowledged was something they often did, making it a part of their 'regular law enforcement duties.' *Andrews* further states that an identified deficiency in a city's training program must be "closely related to the ultimate injury such that the deficiency in training actually causes the police officers' offending conduct." *Id.* (internal quotations and citations omitted). Plaintiffs provided the jury with ample evidence of Defendants' lack of training regarding mental health issues and how that caused Keagan's untimely death. As established by the sworn testimony of multiple officers at trial, the City's training on the topic of mental health issues was non-existent. Although every reporting officer was admittedly aware that they were dealing with a suicidal subject, none of the officers were provided with a plan or were trained to interact with Keagan. Multiple officers testified that they often dealt with individuals dealing with a mental crisis, and, yet, the BPD had no policy or mandated training on the topic prior to the shooting in October 2016. When asked why a course on behavioral mental health would not have been required at the time of the incident, Assistant Chief Hodges stated that it was because "[t]he law did not mandate any training in mental health until August of 2017…" TR., Vol. 4, p. 749-750.

The jury's verdict against the municipality for failure to investigate was based on a robust record. The City had no policy requiring third-party investigations of use-of-force incidents by the Benton Police Department. The jury rightfully returned its verdict in favor of Plaintiffs, based on legally sufficient evidence demonstrating a pattern of violations or deliberate indifference on the part of the city and its policymakers.

## CONCLUSION

Based on the foregoing, Appellants respectfully requests that this Court reverse the district court's Order granting defendants' Motion for Judgment as a Matter of Law, and reinstate the jury's verdict awarding monetary damages to Plaintiffs-Appellants.

Respectfully Submitted:

By: _/s/ Mark Geragos_
MARK J. GERAGOS
**GERAGOS & GERAGOS, APC**
644 South Figueroa Street
Los Angeles, CA 90017-3411
Telephone: (213) 625-3900
Facsimile: (213) 232-3255
geragos@geragos.com

RICHARD E. HOLIMAN
**Holiman Law Firm P.A.**
1501 N. University #225
Little Rock, AR 72207
Phone: (501) 375-1170

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure, Rule 32(a)(7) the undersigned certifies that the accompanying brief:

(1)     has been prepared using 14-point Times New Roman typeface;

(2)     is double-spaced (except for headings and footnotes);

(3)     is proportionally spaced; and

(4)     contains 12,831 words, excluding the parts of the document exempted by FRAP 32(f).

The undersigned further certifies that Microsoft Word was used to compute the word count.

/s/ *Mark J. Geragos*
Mark J. Geragos
*Attorney for Appellants*

## CERTIFICATE OF SERVICE

I, Mark J. Geragos, hereby certify that on June 6, 2024, I electronically filed the foregoing APPELLANT'S OPENING BRIEF with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Mark J. Geragos*
Mark J. Geragos